I don't want to repeat the briefs exactly. I think both sides' briefs were quite good and thorough. In preparing for the argument, I think what would be helpful is to look at the case from a slightly different perspective. This is a case, to some extent, of first impression. There's certainly no case law in the Ninth Circuit about continuing care in retirement communities or CCRCs. Before we get to that, there's an underlying issue here that's really quite interesting to me. As I read your brief, it seems to me you're saying that, at least the literature that was given to the city, says these are going to be able-bodied people, at least 95%. But we're making a claim for disability, and the reason people are disabled is because they're human beings, and when you get old, you get disabled. Is that the argument? No, I think that's only, I'd say, the final chronological part of the argument. How else do you get there? Well, this is actually what I was going to focus on. Exactly, because in the CCRC, there are the three tiers, and two tiers, I think, are less disputable. I think they're all similar, and that's the skilled nursing tier and the assisted living tier. And the theory from the town of Carefree is that those are the only people who would possibly be covered under the Fair Housing Act and the similar statutes. Do you dispute that? Oh, of course. What I was going to focus on was about the primary population group are these independent living, whom the town of Carefree claim would not be disabled, they're the healthy and active people who couldn't even be covered. And the issue is also significant as to the configuration. Why do you need this configuration and size for all these folks when only the small number in the assisted living and skilled nursing? So I wanted to focus on what about these independent living folks, and what are they looking for? And just preliminarily, including these three tiers and having independent living units in a development like this is not some government program, this is market-driven, this is what people want. And the statistics write in the administrative record that there's demand for this in the Carefree area. I'm not talking about something in the administrative record, what people want. And what do these people want? And I think the answer to that will indicate how they define themselves and what needs they're trying to accomplish there. These folks that you're asking me about are not looking for a resort. That's not what they're after. They're not looking for senior-only housing. For example, they're not looking for an apartment building or a housing development that's limited to people over 55, of which there are plenty. And they're a lot cheaper to get into than the development at issue here. What distinguishes this one? These people are looking for a life care arrangement. This is in the state of Arizona, by statute. And I'll quote the statute on page 16 and 17 of our opening brief. What these people are looking for is nursing services, medical services, or health-related services, as defined in another statute. And the other statute defines the health-related services as those pertaining to general supervision, protective, preventive, personal care services, supervisory care services, or directed care services. I hate to interrupt your train of thought here. But I think the main purpose of oral argument is for you to answer our questions that we have. I gather that the other claims, the 1983 Rehabilitation Act 14th Amendment claims, since they're not raised in your brief, those are gone. So we're really just talking about the FHA, right? Well, some of them closely overlap, like the development, the Rehabilitation Act. So I don't just discuss them. Under that scenario, you have to show that the carefree intentionally discriminated against seniors with disabilities when the city denied the special use permit, right? That was one of the three claims under that statute. All right. Okay. Let's start with that. So what disabilities, look at one of the elements of the claim, what disabilities did the potential buyers of these properties have? As I was using with my citation to the Life Care Contract, these people had, and the median, the national median age of these people that we're talking about, the independent living, the median age of people in the nursing, skilled nursing and assisted living was 87. So it's pretty comparable in age. These people, there's no, I mean, these people have all the disabilities associated with aging. You want us to infer, Mr. Bean, that because these people are elderly, that they have disabilities. Are you equating age and disability? One answer to your question, Your Honor, is that what these people were trying to obtain with this housing was an accommodation. I'm not using it in the reasonable accommodation. No, I understand. Was an accommodation of their anticipated disabilities, medical, physical and all the rest. Anticipated. They're anticipated disabilities. And I would use a stronger word, they're inevitable disabilities. Okay, but that gets back to the point I raised in the first place. We're human, we get old, therefore we get disabled. Can you cite any case from anywhere in the United States that has found under the FHA that to be old is to be disabled? I don't claim that. Isn't that the basis of your claim here? I'm saying that this population, which wanted this form of housing, is covered by the FHA and the related statutes, because it supports people given their inevitable disabilities associated with aging. Okay, but you're getting back again to the inevitable disability. The statute requires there to be a disability. You're talking about a future disability of a speculative nature, and admittedly, we all get old and we all get disabled, but don't you have to take that postulate and run it out and assume that because these people are elderly, they are, they will be disabled, but they're not necessarily now disabled. Indeed, your literature says that at least 95 percent will be ambulatory when they go into the facility. There's a physical given at the beginning. That's, I think, maybe what your Honor has in mind. Right. And the purpose of that physical is simply to determine whether the applicant at that time has sufficient disabilities that they must be assigned to a nursing center or the assisted living. In other words, you could have plenty of other, you could require a wheelchair, you could require a walker, you could require support for remembering medications, you could require the whole gamut of services which are built into this project, which is the essence of this project, even if you're living in the independent living units. So the very, what these people want, and I think you've got to look at it from the point of view of the applicants, what they're trying to do. Actually not, isn't what we have to do is to look at the law? Well, yes. The law says they've got to be disabled. And the threshold issue that stems through this and every other aspect of your claim is, are these people disabled? Isn't that right? Or will. I think you're narrowing the question too much. Does the statute say anyone who is disabled or will become disabled? It doesn't, does it? In this case, in this type of housing, the only way to obtain this continuum of care is to enter into a life care contract at the time that you qualify for it actuarially. From a business perspective, we certainly understand why your client would do what it's doing. It would like to have really healthy, non-sick people come in because they make more money that way. But the basis of your claim seems to be that because they're human and they're old, they're going to be sick. And therefore they are, we want, you want the Ninth Circuit to treat your clients as if they are presently disabled. That's a disconnect for me unless I'm missing something. I don't think you have to be presently disabled in order to qualify for protection under the FHA and the related statutes to take care of your inevitable disabilities. That's what you're trying to do. And the only way to take care of them in a certain way, and our law provides people choice. That's right, in the Edmunds case, it's in all the other cases. The idea is to protect people's right to choose the way and the kind of housing, the kind of arrangements they want to take care of their disabilities. Now, if you take the approach that Your Honor is articulating, this type of housing, this type of arrangement, which is extremely popular and growing, and works for people, would essentially never be available for anybody. The Ninth Circuit would destroy this method of housing because you can't qualify for it. You're so seriously disabled that it would meet Your Honor's definition. So the free choice. Let's make that argument. Make that argument. If the city of Carefree said, which I believe the record shows that it does, look, the problem here is you want to be in a residential area. This is a commercial venture. If you want to go over here in this other area of town, hey, great, come on in, we'll give you an SUP. Isn't that what happened? Well, it was a runaround, Your Honor. It was a matter of, you know, this is too residential. So you belong in a commercial zone next to a cemetery perhaps. But isn't that what every city and every county in the United States does? You've got local elected officials who make discrete determinations regarding which things ought to be where, how high they ought to be, what time they can do it so there's not too much noise. We restrict generally commercial businesses to certain areas as opposed to residential. This is remarkably unremarkable, frankly, what we've got here. Why am I missing something here? If I understood the thrust of the question, here we have a residential design program. You know, 92% of the building space is purely residential. Only 8% of the land has any of the quote-unquote commercial features. So it perfectly matches the residential zone parcels on which it was proposed for. Does the record show whether your client was asked whether you'd be willing to take out all of the support areas and just have the residential? Well, again, sure. It would undercut the whole purpose of your commercial venture, wouldn't it? It would destroy this form of housing. Right. The whole purpose of it is to allow people to accommodate their disabilities, and I don't want to go over that track again with you now. But what the town here did is said, well, since some of these accommodations that you require to take care of your disabilities, have employees, for example, and involve a kitchen, well, that makes it a commercial project, and therefore it can't exist in a residential zone. Is that unusual? I don't know how unusual it is, but it's unlawful. Because the whole purpose of the FHA is to allow people with disabilities to live in a residential zone with the accommodations that they need. But that's when we get back to, is it not, to the issue of are these people disabled. If these people aren't disabled, doesn't your whole case crumble? If it doesn't meet the statutory definition, of course. There's no case at all. Okay. And then the question is, do you construe the statutes and questions as narrowly as Your Honor is hopefully suggesting by Socratically, I think that. I'm only speaking Socratically, aren't you? We all do. I think if you just step back and think about that, that the worst that happens. If this postulate is correct, and you can't show that these folks are disabled, the worst that happens is you go to a different part of town of Carefree in a commercial zone, you build the thing there, there's no problem, is there? I think Congress would disagree. I'm sorry? I think Congress would disagree with that. And what do you cite in the congressional record or any statute that ties to this? The FHA. Okay. Only the protection for disability. Let me talk about an analogy that just occurs to me. Okay. Let's take a group home for people who are retarded. Admittedly, that's a disability. Right. Okay. Let's say in that group home, it's anticipated. Let's say these are young, retarded folks, and they're going to stay there for ten years or maybe a lifetime. And it's known in general that in the course of the life of a retarded individual, they may need certain kind of support. So that's built into the program. I believe Your Honor's argument or question, judge's argument, I think the position you're articulating would suggest that unless everybody in that home has a present need, a demonstrable present need for a particular service not covered by the FHA, that the families and the children and the providers of that type of facility cannot anticipate future needs and, therefore, cannot require the protection that a town, a zoning authority would be able to say, well, no, no, no, no, you can't do that. You wanted to reserve your time, Mr. Bina. Why don't you hold that good thought? You're on a roll, so come back in just a minute when we get counsel for the city. Thank you. Good afternoon, Your Honors. I'm representing the town of Carefree in this case. And I would like to make some preparatory comments, if I may. When this application was presented to the town, the town did not in ever say, we want to build a project for disabled persons. In fact, that word was never used throughout the entire process that went through the town. They presented, what they presented to the town was a project for active retired persons. In fact, they're going to be so active, they're going to have to take a physical. And after what? Take a physical exam to be entered. Now, what was the purpose of that physical? It was revealed by the appellant in an interview with the EEOC officer, which is part of the excerpt or record, and it says the reason, the only reason you have to take the physical, to see if you can qualify for an insurance contract. An insurance contract that you will enter into with us that will pay for all your medical needs as long as you may live. That was the purpose of it. It's a disability policy? Is that what it was? It was a policy of insurance that says if you ever become disabled, we will pay the expenses. That's what it was. And that's where this, quote, continued care thing comes from. But it's what they presented to the town was we are going to build an opulate resort. They used that term three or four times at three or four different public hearings. In fact, they tried to distinguish themselves from a former applicant that was granted a special use permit for assisted care and nursing care. They said we're not like that at all. We are going to be a resort-type community, and we are going to supply amenities to everybody that lives here, all these physically fit people, 171 units. We're going to supply them with a 17,000-square-foot restaurant, by far the largest restaurant in the town of Carefree. We're going to supply them with all these other amenities such as hair care and washing facilities and so forth. So, you know, it is almost two stories we're getting here. The story that was presented to the town, and then a dramatically changed story that was presented to the district court. I would like to comment a little bit about the appellant's brief. And once again, I would also agree that only the Fair Housing Act is at issue in this appeal. Appellant's brief states that contrary to the district court decision that they raised tribal issues of fact for disparate treatment, disparate impact, and reasonable accommodation. But their premise for this appeal is that the appellant did raise tribal issues of fact, that there was intentional discrimination by the town council. But the zoning case, as all zoning cases, were determined upon an expansive public record. Zoning cases are done in public. Nothing is said that isn't on the record. There were citizen review meetings, council meetings, and zoning meetings. All facts that the appellant alleged shows tribal issues were before the district judge when he made his decision on the summary judgment. This is not at all like an employment discrimination case, where employment decisions are made not on the public record, but are made in private meetings. And this case is not similar to the holdings that were cited by the applicants in U.S. California Mobile Home Park Management Company, where the court reversed the grant of a motion to dismiss based upon the pleadings. Nor is it like the hostile work environment case in the McGintz case that the appellant cited. A plaintiff cannot defeat a motion for summary judgment merely by denying the legitimate governmental reasons for the action, nor based upon subjective belief that said reason was just a pretext for the governmental action. And I cite to you footnote 6 to the Cornwell case cited by the appellant, 439-Fed3-1018. The premise of their intentional discrimination, at least in their briefs, is that there is a demand for continuing care in this country, and the developer wanted to take advantage of that demand. But the fact that the proposed development contained a large commercial component somehow meant there was intentional discrimination by the town council. The fact that the town attorney gave a legal opinion that did not affect the ultimate vote in this case somehow was a sign of intentional discrimination. Well, that legal opinion would be given in any zoning case, whether it involved disabled people, non-disabled people, young people, old people. That's the law in Arizona. Then the only other fact that they seem to raise to show this, quote, intentional discrimination, is that four months after this decision was made, the town made a major amendment to its zoning ordinance, and it excluded this type of group home from a commercial area. But it's all that did is put all residential housing out of commercial areas because only those were permitted at that time in commercial areas. By the way, they were still allowed in office areas, in semi-commercial areas, those buffer areas. And then, amazingly enough, they say, making an attempt to accommodate the applicant's post-hearings request for accommodation somehow shows intentional discrimination. But these arguments by appellants are only speculative flavors they add on top of the facts of this case, which, again, are all in the public record. They do not indicate triable issues of fact on the case of the required elements of proof of an FHA claim. What the record does reflect is that there was no inconsistent actions by the town council in granting special use permits for non-disabled persons. Appellants' attempt to characterize the motives of council members as being discriminatory is merely speculative belief, clearly not demonstrated by the record, or merely a denial of legitimate reasons set forth. Mr. Woodford, you've prepared a very good argument there. But it seems to me that the first thing that the plaintiff would have to show, if he was trying to win his case, would be that there was intentional discrimination against disabled people. That's correct. And to show that, he would have to show that there was a similar application for disabled people that was granted. And here, the city, faced with a similar application, had denied it. That's correct, Your Honor. Has he shown that? There was. He did not show that, and that is part of the district court finding. That takes care of the intentional discrimination. Then he could also show that there was a disparate impact on the disabled by the denial of the application that he filed. Has he shown that there was a disparate impact on the disabled people? He has not. The district court found that there was no facts to substantiate a disparate impact introduced by the plaintiff. No statistical proof was offered, and the town had approved a like-type facility less than a mile from this application. Okay. Now, then the other thing he could show, I suppose, is that there had been a failure to reasonably accommodate what he was requesting. Even though the city did not approve what he was requesting, they had offered some reasonable accommodation. Did the city do that? Absolutely, Your Honor. And the background to that is this. Well, the background or not, if they did it, then he can't claim there was a failure of reasonable accommodation. Well, the record is very sufficient to show that one month after the decision, the appellants asked for an accommodation for the very first time, for the very first time mentioning disabled persons. They met with the council. They met with the neighbors. There were three different scenarios that the town put forward to say, well, maybe we could do this. They refused all of them and suggested no accommodations themselves. Okay. If there was no intentional discrimination against the disabled, no adverse impact upon the disabled through discrimination, I guess, and no failure to reasonably accommodate, is there any other basis on which the plaintiff could win this suit? No, because that's the only thing they have appealed in front of Your Honor. And that's the argument you're making, isn't it? That's correct, Your Honor. Well, go ahead and make it if you wish. I think we understand it. I would just like to give a concluding remark, Your Honor. To accept the appellant's argument in this appeal would mean that this court would either sit as a super zoning commission of the town, taking all judgment away from those officials as to the proper planning and zoning of their community, or it would rewrite their zoning ordinance to allow any development for older citizens, no matter how dense or how many commercial amenities it contained, to be built anywhere in the town, including its low-density districts. Are you suggesting that the older citizens were dense or that the housing would be dense? Not the court's decision. I find older citizens not very dense. I find them very wise. And I do that in the mirror almost every day. We all appreciate that. Some more than others. I would urge this court to uphold the well-reasoned decision of the district court. Thank you. Thank you very much for your presentation. Mr. Bean, do you want to finish up? I may not need all five minutes, but having turned 62 recently, I could have qualified for this development, and I certainly hope that age and experience all the time. You're just a baby, Mr. Bean. December 26th. All right. If this court were to find that people moving into the independent living units were not disabled, the case goes away and we don't have to address proof of violation, then, of course, the project wouldn't even be covered by the various statutes that we're asserting. And just to mention a small piece of the coverage issue, Mr. Woodford argues, as he has in the brief, that we never mentioned the possibility of any disabilities to the town. And ever since the first citizen participation meetings, correspondence to the town, the very application and the application itself, all in the administrative record, my clients always mentioned that not only would there be skilled nursing and assisted living units, but for the vast majority in the independent living units, there would be home health care services, and they would be coming in on a life care contract that would extend to other services as well. It's sort of like saying, well, we applied for a hospital, but to build a hospital, but we didn't mention that there were going to be any sick people there. The very essence of this project was to provide health and supportive services for the entire gamut of the residents anticipated there. I've racked my brains while I was sitting here during Mr. Woodford's argument to try to come back to our dialogue about coverage. And the best I can do, and I think I've said it before, and I'm not going to elaborate and repeat myself. Superfluity does not vitiate according to the California Civil Code. All right. And you can say it again if you like. I haven't heard anything. Just the consequences of such a decision would be that, I'll just say it once rather than twice, that I think the statute, the FHA and others were designed to preserve the free choice of individuals to take care of their disabilities as they see fit. No one has suggested, by the way, that this is an irrational or unworkable or stupid kind of way that these people want to take care of it. It's not that they want to go out and do a rain dance or put a bowling alley somewhere, because it's going to help our health. This is a tried and true, very rational, in fact a very successful model for taking care of older people with disabilities, not just older people, but with disabilities. And a narrow definition of the intake, of the stage that you have to be, the health you have to have or disabilities you have to have or not have at the beginning, would eliminate this choice, would eliminate any protection for this choice, would allow towns like Carefree throughout the country, or at least throughout the Ninth Circuit, not to accept programs like this. That's the ultimate policy choice. That's the choice I believe Congress has made in giving, and certainly the courts, and this Edmunds case, this Court's Edmunds decision says that, pardon me, that the FHA was intended to, I'm quoting here Edmunds, intended to protect the right of handicapped persons to live in the residence of their choice in the community. Unless people can sign up for this type of choice, when they actuarially qualify for it, it will never be available to them. By the time they have a disability, which might show up later in life, it's too late. That's the ultimate choice here. I have repeated it once and I won't again. So unless there are questions, I'll just submit it. We thank you both gentlemen for your fine and interesting argument. We thank the Court for its attentiveness as well. Our pleasure. The case of Budnick v. Town of Carefree is submitted. The Court will stand adjourned, but we're going to take five minutes. We'll come back, and we have some law students who are here, and Kathy will be right back, and then we'll talk to them. Anybody else who wants to stay, they're welcome to do that as well. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned.
judges: Canby, Thompson, Smith